JOSEPH S. CLARKE AND RICHARD S. BRISCOE, APPELLANTS v. WIL-
LIAM G. W. WHITE, APPELLEE.

The doctrine of a court of chancery in cases for specific performance, has reference, ordinarily, to executory agreements for the conveyance of lands; and is rarely applied to contracts affecting personal property. Where the relief prayed for in a bill, is the delivery to the complainant of instruments to which he is entitled, and not the execution of an executory contract, no further than to decree the amount the complainant has been compelled to pay against the terms of the contract; chancery has jurisdiction of the cause; and the court will end the cause, without sending the parties to law as to part, having granted relief for part.

The rule in chancery is, if the answer of the defendant admits a fact, but insists on matter by way of avoidance; the complainant need not prove the fact admitted, but the defendant must prove the matter in avoidance.

It is generally true in cases of composition, that the debtor who agrees to pay a less sum in the discharge of a contract, must pay punctually; for until performance, the creditor is not bound. The reason is obvious; the creditor has the sole right of modifying the first contract, and of prescribing the conditions of its discharge. If the agreement stipulates for partial payments, and the debtor fails to pay; the condition to take part is broken, the second contract forfeited, and is no bar to the original cause of action.

In a composition for a debt, by which one party agreed to deliver goods to the amount of seventy per cent. in satisfaction of a debt exceeding ten thousand dollars, and omitted to deliver within one dollar and forty-one cents of the amount; the mistake is too trivial to deserve notice.

The true rule as to the interference of a court of equity in relation to contracts, in which fraud is alleged, was laid down in Conard v. The Atlantic Insurance Company, 4 Peters, 297. "If the person against whom the fraud is alleged, should be proven to have been guilty of it in any number of instances; still, if the particular act sought to be avoided, be not shown to be tainted with fraud; it cannot be asserted with the other frauds; unless in some way or other it be connected with, or form a part of them."

In equity, as in law, fraud and injury must concur to furnish ground for judicial action. A mere fraudulent intent, unaccompanied by any injurious act, is not the subject of judicial cognizance. Fraud ought not to be conceived; it must be proved, and expressly found.

By the common law, a deed of land is valid without registration; and where register acts require deeds to be recorded, they are valid until the time prescribed by the statute has expired; and, if recorded within the time, are as effectual from the date of execution, as if no register act existed.

Where there is clearly a bona fide grantor, the grant is not one of those conveyances within the statutes against fraudulent conveyances.

W. purchased a lot of ground in the city of Washington, early in 1829, for one thousand five hundred and thirty-two dollars, on a credit of one, two and three years; and paid the notes at maturity. He took possession immediately after the purchase, and commenced improving by erecting buildings on it. On the 14th of

[Clarke et al. v. White.]

January, 1832, Smith, who had sold the land at the request of W.; conveyed it to a trustee, for the benefit of the infant children of W. The improvements before the deed, amounted in value to three thousand dollars, and after the deed to twelve hundred dollars, or fifteen hundred dollars. He failed in December, 1833; and the property was then worth about six thousand dollars. The deed of conveyance by Smith, was not recorded until within one day of the expiration of the time prescribed for recording such deed, by the statute of Maryland. The parties who made a composition of a large debt due to them by W., in which composition they sustained a loss of thirty per cent., knew at the time of the composition of the conveyance of this property to the infant children of W. and of his large improvements on the same; and made the composition with this knowledge. The Court refused to declare the agreement of composition void, because of this transaction. He who purchases unsound property, with knowledge of its unsoundness at the time, cannot maintain an action against the seller: So if one compounds a debt, or makes any other contract, with a full knowledge of all the facts, acting at arm's length upon his judgment, and fails to guard against loss; he must abide by the consequences. Neither fraud nor mistake can be imputed to such an agreement.

If, upon failure or insolvency; one creditor goes into a contract of general composition common to the others; at the same time, having an underhand agreement with the debtor, to receive a larger per cent.; such agreement is fraudulent and void.

The rule cutting off underhand agreements in cases of joint and general compositions, as a fraud upon the other compounding creditors; and because such agreements are subversive of sound morals and public policy; has no application to a case where each creditor acts not only for himself, but in opposition to every other creditor : all equally relying on their vigilance to gain a priority; which, if obtained, each being entitled to have satisfaction; cannot be questioned.

The debtor may prefer one creditor, pay him fully, and exhaust his whole property, leaving nothing for others equally meritorious.

Before a composition was made by a debtor with two of his creditors, who were partners, in which it was agreed that certain notes given by him to the creditors, should be delivered up to him, two of the notes, among those agreed by the composition to be delivered up, had been, before they were at maturity, passed away by the creditors. The debtor asked, by a bill filed against his creditors, with whom he had made the composition, that the court should order these notes to be delivered to him. Held, that the decree of the circuit court, refusing to order these notes should be delivered up, was correct.

ON appeal from the circuit court of the United States, for the county of Washington, in the District of Columbia.

In the circuit court, the appellee, William G. W. White, filed a bill against the appellants, charging, that on the 2d of July, 1832, the complainant passed to the defendants, Clarke and Briscoe, his twenty-six promissory notes of that date, each for the sum of two hundred and seventy-four dollars and sixty-seven cents, payable monthly, from sixteen to forty-four months, making the sum of seven thousand one hundred and forty-one dollars and forty-two

cents; three of which said notes were subsequently passed by said defendants to Clagett and Washington. That on the 30th December, 1833, he entered into an agreement with the said Clarke and Briscoe, to anticipate the period of credit on the said notes, and to pay the said sum of seven thousand one hundred and forty-one dollars and forty-two cents, in goods and merchandise, at seventy cents in the dollar, on the price the said goods were marked to have cost; that the said Clarke and Briscoe agreed to receive the said goods and merchandise, on the terms aforesaid, in full payment of the said sum of money, and to deliver up the said notes then in their possession; and speedily to take up such of the said notes as had been negotiated, and to deliver the whole to the complainant, that they might be cancelled. The complainant states that he fulfilled his part of the agreement in every particular; that he delivered to said Clarke and Briscoe, and they received goods and merchandise according to the terms of the said contract, to the full amount agreed to be delivered, save a fraction of one dollar and forty-one cents, which was subsequently tendered and refused; but that the said Clarke and Briscoe, having obtained possession of the said goods, retain the said notes, and refuse to perform their part of the said agreement. The complainant, in a supplemental bill, states that Clagett and Washington, to whom three of the said notes had been passed by the defendants, after the date of the said agreement, instituted suits against the complainant, on the said three notes, in the circuit court of the District of Columbia; and that by judgment of the said court, the complainant has been obliged to pay, and had paid to the said Clagett and Washington, the sum of one thousand and eighty-three dollars and fifty-five cents. The complainant prays, that Clarke and Briscoe may be, by decree, ordered to bring into court the said unpaid notes to be cancelled; and to pay to the complainant the said sum of one thousand and eighty-three dollars and fifty-five cents, so paid to Clagett and Washington; and for general relief.

The answer of the defendants, the appellants, admits that the complainant gave the several promissory notes mentioned in the bill, and that three of the same were passed to Clagett and Washington, as stated; and they say the consideration for the notes, was the sale of a large invoice of goods, made about the time of the dates of the notes, or shortly before; that the terms and conditions of such sale were, that the complainant should punctually take up and pay the notes, as the same should respectively fall due; and, in

consideration of the complainant's solemn verbal pledge and assurance, that such notes should be so punctually taken up and paid; and upon the faith and confidence of such pledge and assurance, the defendants agreed to deduct five per cent. from the amount of said invoice, and accordingly from the aggregate amount, for which the complainant passed his notes, on account of said sale. The defendants deny that they did make the agreement with complainant, respecting the compromise of their claim against the complainant, and the cancelling of the notes, in the terms and upon the conditions set forth in the bill; but they admit and aver, that, about the time mentioned in the bill, in consequence of hearing the complainant had failed in business, and was compromising with his creditors, a conversation and arrangement did take place between the defendant, Clarke, and the complainant; in which the defendant asked him upon what terms the complainant would settle the whole claim of the defendants; not merely on what terms he would settle the amount of the notes; upon which complainant offered to settle it at sixty cents in the dollar, and pay in goods. Clarke answered, that he understood the complainant had compromised with other of his creditors at seventy cents in the dollar; and hoped the complainant would not think of putting off the defendants with less; and the complainant at length agreed to pay the defendants, in goods, the whole amount of their claim, at the rate of seventy cents in the dollar, and pay the balance, viz. thirty per cent., when he was able: but insisted that they should take the goods in masses, without selection, as they lay upon the shelves; which was finally agreed to by defendant, Clarke: nor was it till after the arrangement had been so agreed on between themselves, that any thing was said between them, about the defendants' getting up and cancelling the complainant's notes: but, afterwards, they admit a conversation on that subject did ensue between defendant, Clarke, and the complainant, in which it was understood and arranged between them, that, upon the settlement of the defendants' whole claim, by paying the same in goods, at the rate of seventy cents in the dollar, the defendants should get in and cancel said notes; not upon the settlement, in that mode, of the amount of the notes merely: such was not the understanding of the parties, at least not of either of the defendants; but the true amount of their just claim against the complainant; the amount understood by defendant, Clarke, at the time, was not the aggregate amount of the notes merely, but of the original invoice; in liquidation of the amount of which, with

a deduction of five per cent., the notes had been given: and, inasmuch as that deduction had been allowed, upon the faith and confidence alone of the complainant's pledge and assurance to pay the notes punctually, as aforesaid; and, as he had totally failed to comply with said pledge and assurance, the defendants considered that in equity, indeed in strict justice, they were entitled to the amount of the invoice, without such deduction.

The answer of the defendants further states, that the complainant has not, to the time of filing the answer, complied substantially or otherwise with the terms of the compromise, in the sense in which it was properly understood and agreed upon, so as to entitle him at any time to call in the notes given for the goods delivered to him; that the notes were to be delivered to him, on the entire settlement of the claims of the respondents on him, he not having delivered goods to the respondents to the amount of the bill, and he having refused to deliver the goods to the respondents, without the said deduction. That the goods delivered to the respondents were the residue or remains of the goods originally sold to the complainant, after he had enjoyed the use and profit of them, as a part of his assortment of goods, for eighteen months; and if the compromise had been carried fully into effect, it would have been a most hard and disadvantageous one to the respondents. The compromise was not binding on the respondents, in consequence of the gross frauds and impositions practised by the complainant upon the respondents, and his other creditors, in order to alarm them into compromises of their debts with him, as with a merchant debtor, who has been subjected by the casualties of trade to failure; that the whole matter of the pretended failure of the complainant, was a deliberate, artful and fraudulent scheme, device and contrivance of the complainant to alarm and force his creditors into compromises; while he had, in part, ample means to pay off all his debts, and have a surplus on hand; that with these ample means, he proclaimed his insolvency, and was thus enabled to make advantageous compromises with his creditors, according to the circumstances of his creditors, and the state of their fears. That preparatory to this scheme of fraudulent failure, and during the very season, and shortly before it was proclaimed, he had made unusually large purchases on credit, and had so increased his stock of goods much beyond its usual amount; and, just after he had completed this fraudulent accumulation of stock, he gave out his failure in business and insolvency, and set on foot his plan of fraudu-

[Clarke et al. v. White.]

lent compromises. It was under the greatest pressure of this alarm, and whilst it was fraudulently used by complainant to practise upon the fears of his creditors, that the defendants were fraudulently and deceitfully drawn by him into such agreement, for a compromise, as they have stated and admitted.

The answer further states, that it is the belief of the defendants, that the complainant had for some time meditated the frauds perpetrated by him; and that before he purchased the goods from the defendants, some time about the 9th of July, 1832, he caused to be entered in the land records of this county, a fraudulent deed, settling valuable property on his family, which had been executed in the month of January preceding; and in the meantime kept secret. This deed conveys the property described in it to a trustee, for the children of the complainant, all minors, and in extreme youth; and was not recorded until within one day of the six months allowed by the law of the District of Columbia, had nearly expired.

To the answer of the defendants, a general replication was filed, and the parties went on to take depositions to maintain or deny the allegations in the pleadings. No evidence was given to sustain the assertion in the answer, that the complainant agreed, at any time, to pay the residue of the debt to the defendants, if he should be able, at any time afterwards, to pay the same. The evidence contained in these depositions is fully stated in the opinion of the court.

The circuit court gave a decree in favour of the complainant, according to the prayer of the bill; and the respondents presented this appeal.

The case was argued by Mr. Hoban and Mr. Jones for the appellants, and by Mr. Marbury and Mr. Key for the appellee.

The counsel for the appellants contended—

1. The complainant has laid no ground in his bill for equitable relief. Neither the agreement itself, as alleged in the bill, nor any of the collateral circumstances, being of a nature to call for specific performance, or any other relief in equity.

2. But whatever the terms or the nature of the composition, and however fit it may be in its own nature for specific performance in equity, the whole of the complainant's equity is repelled by a countervailing equity in defendants, from his promise, as one of their concomitant inducements to the composition, to pay the full amount

of the debt, when able to do so; and from the fact, both averred and proved, that he was able to pay the whole debt.

3. A composition of a failing trader with his creditors, being strictissimi juris, must be fulfilled by the debtor to the letter; and any failure in complying with its terms, in a minute particular on his part, however far he may go in part performance, vitiates and annuls the whole composition.

4. According to the complainant's own showing, he has failed to fulfil the composition in terminis; and he has, to this day, something further to do in order to fulfil it: yet he has not even been decreed to fulfil it.

5. There is no evidence in the cause competent and sufficient to overrule so much of the answer as denies the agreement for composition alleged in the bill, and avers a materially different agreement.

6. Taking the terms of the composition to be such as the answer avers, and puts in the place of what it denies; there appears a still more important, palpable, and fatal breach of its terms on the part of complainant.

7. The actual, frauds, which the answer charges, in the elaboration of the scheme of artificial and feigned failure and insolvency for defrauding the creditors of their dues, and overreaching them with unfair compositions under deceitful pretexts; are fully made out in proof; and are sufficient, and more than sufficient, to set aside the complainant's composition with the defendants, and every composition with his other creditors.

8. The inequality alone in his various compositions with his creditors, (all the other circumstances of fraud being out of the question,) is a fraud, per se, both at law and equity; and sufficient of itself, either at law or in equity, to vitiate and set aside each and every of the compositions, from the lowest to the highest.

The counsel argued that the actual proofs in the case not only sustain the answer on the second ground of defence throughout, but make out a far stronger case, in detail, than the general averments of the answer had represented it.

They argued as to the long concocted and prepared scheme of fraud, with a view to failure in business and feigned insolvency; and to consequent compositions with creditors, under the pressure of alarm for the safety of their debts; two prominent facts are, in addition to many minuter circumstances, fully and conclusively proved. First, as to the settlement of certain real estate on his minor chil-

[Clarke et al. v. White.]

dren, as stated in the answer. It appears that in 1829 he purchased the property in his own name, and on his own account, and gave his notes for the purchase money by instalments, and was to receive a conveyance upon payment of the last instalment; that he duly paid up all the instalments out of his own proper means and resources; that when, upon payment of the last instalment, he called for a conveyance, he took it to his brother, a youth of seventeen or eighteen years, in trust, for his three children, the oldest of whom was then only five years old, and consequently was less than two years old at the time of the purchase, more than three years before; that he had never given the slightest intimation, during all the three years he had held and improved the property, of any trust for his children, till he called for such conveyance; and that he had expended about four thousand five hundred dollars of his own money in buildings upon the property—three thousand dollars before, and fifteen hundred dollars after the conveyance in trust. The deed bears date on the 14th January, 1832, and was not produced for public record till the 13th July following, the very day before it would have run out of date; and in the mean time, whilst that conveyance was kept secret, and he stood forward as the ostensible owner of the property, he contracted this large debt to the defendants, by a purchase of their goods to the amount of near thirteen thousand dollars; just ten or eleven days before he produced the deed, and had it committed to public record. There is no averment or pretence, either in pleading or evidence, of any good or valuable consideration for this settlement; on the contrary, the terms and recitals of the deed itself, and all the circumstances in evidence conclusively repel the presumption of any such consideration. Second: that in laying in his stock of goods for the fall season of 1833, by purchases of goods in the northern cities, at a time just before his alleged failure in business, and when he must have necessarily anticipated the result if it arose from any real difficulty and embarrassment in his circumstances, he purchased a much larger stock than he had ever been accustomed to lay in; and with all this increased stock, or the proceeds, fresh and full in hand, suddenly and unexpectedly to all the world announced, not any mere difficulty and embarrassment in his affairs, but absolute and hopeless insolvency, and an immense deficit of assets in proportion to his debts; and upon that footing negotiated his compositions with his creditors.

As to the charge of an artificial and feigned failure and insolvency,

[Clarke et al. v. White.]

the actual proof in the cause is cogent to the conclusion, that he broke full handed; with abundance of assets to pay all his debts; and that he made an immense profit from his compositions with his creditors.

As to the charge in the answer respecting the inequalities in his compositions with his various creditors, that, also, is more than sustained in proof: for it appears, that whilst he was compounding with the mass of his creditors at various rates, from forty to eighty-seven cents in the-dollar, according as he could work upon their fears of still heavier losses from his insolvency; he actually paid particular individuals, whom he found more sagacious and firm than the others, the whole amount of their claims, after unavailing attempts to beat them down to a composition.

Pending this suit, Clagett & Washington recovered judgments at law against him on his three notes passed to them by defendants, amounting, with interest and costs, to one thousand eighty-three dollars fifty-five cents; all of which judgments he fully satisfied before the final decree passed in this cause.

By that decree the defendants are decreed to refund to the complainant the amount so paid by him to Clagett and Washington, with interest on the same from the date of the decree; and, without delay, to bring into court the remaining twenty-three of said notes, to be cancelled; which notes are declared by the decree to be forever null and void, &c.

The counsel for the appellants cited 2 Atkyns, 566; 2 Story's Equity, 18; 1 Vernon, 47, 210; 2 Comy. on Contracts, 380; 1 Stra. Rep. 425; 1 Bro. Chan. 167; 1 Story's Equity, 250; 1 Pickering's Rep. 340; Dickson, 411; 1 Chan. Cases, 103.

Mr. Marbury and Mr. Jones, the counsel for the appellee, contended:

1. That the contract between the complainant and defendant of the 30th December, 1833, is truly stated in the bill; and has been fully complied with on the part of the complainant.

2. That the said contract was made at the instance and by the request of the appellants, without solicitation on the part of the complainant; and without any fraud or imposition practised by him on the defendants to induce them to enter into the same.

3. That the relief prayed for by the complainant below, is within the jurisdiction of a court of equity.

The counsel for the appellee denied all fraud in the transactions between him and the appellants. While the appellee substantially

and effectually complied with his agreement, the appellants have alto-
gether failed on their part. The misfortunes of the appellee obliged
him to make the compromises effected with his creditors; and that
which was entered into with the appellants was made in good faith,
and was so executed by him. The agreement made with the appel-
lants was that stated in the bill; and the appellants did not prove in
the circuit court any other agreement. Many of the allegations in
the answers are not supported by proof; and they are therefore to
have no weight with the Court in their consideration of the case.

A court of chancery has jurisdiction to direct the delivery of notes
or bonds, or deeds, which a party cannot, in conscience, withhold;
1 John. Chan. Rep. 517; 2 Story's Equity, 11.

The settlement of the real estate was open and notorious. The deed
was put upon the public records. The compromise made with the
appellants, had no connection with arrangements made with other
creditors; and is not to be affected by them. The principles of law
which render a composition with creditors void, on the ground of in-
equality or concealment, do not apply to such a case as this. Where
a general compromise is made, apparently equal, but some of the
creditors have been induced to assent to it by a private, and more
beneficial agreement; it will be void. But such is not the case before
the Court. Cases cited in the argument, 5 East, 230; 5 John. Rep.
291; 12 Price's Rep. 183.

Mr. Justice CATRON delivered the opinion of the Court:

The appellants contend the decree should be reversed, and the
bill dismissed; upon various propositions of law and fact.

1st. It is insisted: "The complainant has laid no ground in his
bill for equitable relief. Neither the agreement itself, as alleged in
the bill, nor any of the collateral circumstances, being of a nature
to call for a specific performance in equity."

The doctrine of specific performance has reference, ordinarily, to
executory agreements for the conveyance of lands, and is rarely ap-
plied to contracts affecting personal property. 2 Story's Eq. 26, 36.
Nor is relief sought by the complainant on this head of jurisdiction.
To encumber the case made by the pleadings with doctrines foreign
to the subject matter litigated, would tend to confound principles
in their nature dissimilar and separate. The relief prayed, is the
delivery to the complainant of instruments to which he is entitled.
2 Story's Eq. 12. Not the execution of an executory contract, fur-

[Clarke et al. v. White.]

ther than to decree the amount he has been compelled to pay to Clagett and Washington; which is an incident to the exercise of jurisdiction that coerces the delivery of the instruments.

So material a part of the transaction being clearly within the jurisdiction of the Court, it will of course end the cause; without sending the parties to law as to part, having granted relief for part.

2d. It is assumed: "But whatever the terms, or the nature of the composition, and however fit it may be, in its own nature, for specific performance in equity, the whole of the complainant's equity is repelled by a countervailing equity in defendants; from his promise as one of their concomitant inducements to the composition to pay the full amount of the debt, when able to do so; and from the fact, both averred and proved, that he was able to pay the whole debt. Did the complainant, White, promise to pay the full amount of the debt when he was able to do so; and, by this means, induce the respondents to make a composition then to receive seventy cents in the dollar, as partial payment? If this was the contract, and the complainant was able to pay the full amount at the time, he was immediately bound for the thirty cents in the dollar in addition; and the respondents are entitled either to have the bill dismissed, so that they may enforce the contract at law, for the balance due; or they must have administered to them in equity the same relief, by a decree for the thirty per cent.; founded on the familiar rule, that he who seeks equity, must, as a condition, do equity to the respondents, before the relief can be granted. We must, therefore, inquire what the contract was. The bill, in substance, alleges that the aggregate amount secured by the notes prayed to be surrendered, was seven thousand one hundred and forty-one dollars and forty-two cents; that the notes were not due when the composition was made; that the parties entered into an agreement to anticipate the period of credit on them, by which White undertook to deliver to Clarke and Briscoe, and they agreed to receive of White, goods and merchandise, in full payment of the sum due, at the rate of seventy cents in the dollar, estimating the goods then in White's store, at the prices marked on them as cost prices; that the goods were delivered in discharge of the debt; and the notes, as evidences of it, were to be surrendered to White, on the delivery of the goods.

To this specific allegation, it is answered: "These defendants deny that they did make the agreement with complainant respecting the compromise of their claim against the complainant; and the

[Clarke et al. v. White.]

cancelling of said notes in the terms, and upon the conditions set forth in said bill: but they admit and aver, that about the time mentioned in said bill, in consequence of hearing the complainant had failed in business, and was compromising with his creditors, a conversation and arrangement did take place between the defendant, Clarke, and the complainant; in which said defendant asked him upon what terms the complainant would settle the whole claim of the defendants, not merely on what terms he would settle the amount of said notes; upon which complainant offered to settle it at sixty cents in the dollar, and pay in goods. Said defendant, Clarke, answered that he understood complainant had compromised with other of his creditors at seventy cents in the dollar, and hoped complainant would not think of putting off the defendants with less; and complainant at length agreed to pay defendants, in goods, the whole amount of their claim, at the rate of seventy cents in the dollar, and pay the balance, viz. thirty per cent., when he was able: but insisted that they should take the goods in masses, without selection, as they lay upon the shelves; which was finally agreed to by defendant, Clarke: nor was it till after the arrangement had been so agreed on between themselves, that any thing was said between them about the defendants' getting up and cancelling the complainant's notes: but afterwards, they admit a conversation on that subject did ensue between defendant, Clarke, and the complainant, in which it was understood and arranged between them, that upon the settlement of the defendants' whole claim, by paying the same in goods at the rate of seventy cents in the dollar; the defendants should get in and cancel said notes; not upon the settlement in that mode of the amount of the notes merely; such was not the understanding of the parties, at least of either of these defendants: but the true amount of their just claim against the complainant; the amount understood by defendant, Clarke, at the time, was not the aggregate amount of the notes merely, but of the original invoice, in liquidation of the amount of which, with a deduction of five per cent., the notes had been given; and inasmuch as that deduction had been allowed upon the faith and confidence alone of the complainant's said pledge and assurance to pay the said notes, punctually, as aforesaid; and as he had totally failed to comply with said pledge and assurance, these defendants considered that, in equity, indeed, in strict justice, they were entitled to the amount of the invoice, without such deduction?"

Whether the thirty per cent., in addition, is due to the appellants

by the contract, depends on the evidence: the answer admits the agreement of composition to be truly set out in the bill, so far as it is set forth; but insists, that so much of it as stipulated for the full payment of the notes when the complainant was able, is omitted. The rule in such case is: " If the answer of the defendant admits a fact, but insists on matter by way of avoidance, the complainant need not prove the fact admitted, but the defendant must prove the matter in avoidance." Dyer, 108.   The defendants adduced no evidence, tending in the slightest degree to establish the statement in the answer. The complainant, however, proceeded to prove the contract by different witnesses, to be such (and no other,) as the bill alleges it to have been.   We give extracts from the depositions of two of his witnesses.

" Do you or do you not remember a compromise made between the complainant and the defendants, Clarke and Briscoe, relative to the payment of a certain debt due from the said complainant to the said defendants?   If yea, state the subject of the said compromise, and the terms of it."

" To the second.   I do.   The claim was for the original purchase made of Clarke and Briscoe, by complainant, in 1832; and the agreement was to pay the notes given for that purchase, by giving them goods at seventy cents in the dollar, at the prices which they were marked as having cost.   Mr. Clarke made the agreement.   He was to commence at any part of the store he chose, and take the goods as they came, till his claim was satisfied.   Some of the notes had been passed away by Clarke and Briscoe.   These they were to take up, and return with the other notes, to Mr. White, as soon after the goods were delivered as he could get them.   There were no engagements, so far as I know, to pay the balance of thirty per cent. at any time.   I was present when the bargain was made.   They took the goods upon those terms, to the full amount of their claim, except one dollar and forty-one cents."

" To the second.   I recollect Mr. Clarke's coming into Mr. White's store, and wishing to know in what way they would settle. The result of their conversation was, that Mr. White should give him seventy cents in the dollar, in goods, for the amount of his claim.   The claim was for the balance due to Clarke and Briscoe, for the purchase of a stock of goods made of them by Mr. White, in 1832.   The terms of the compromise were, that Mr. Clarke should commence at any part of the store where he chose, and go on taking

all the goods as they came, till he got the full amount of his claim, at seventy cents in the dollar, at the price which the goods were marked to have cost. Mr. Clarke was to deliver up to Mr. White the notes which remained unpaid for the purchase in 1832."

The assumption, therefore, that the complainant's equity is repelled by the countervailing equity of the defendants, because of the promise to pay the full amount of the debt when complainant was able; cannot be sustained.

It is, third and fourth, assumed, that " A composition of a failing trader with his creditor, being strictissimi juris, must be fulfilled by the debtor to the letter; and any failure in complying with its terms, in a minute particular on his part, however far he may go in part performance, vitiates and annuls the whole composition.

" According to the complainant's own showing, he has failed to fulfil the composition in terminis; and he has, to this day, something further to do in order to fulfil it; yet he has not even been decreed to fulfil it."

It is generally true, in cases of composition, that the debtor who agrees to pay a less sum in discharge of a contract, must pay punctually; for, until performance, the creditor is not bound. The reason is obvious; the creditor has the sole right of modifying the first contract, and of prescribing the conditions of its discharge; if the agreement for composition stipulates for partial payment, and the debtor fails to pay, the condition to take part is broken, the second contract forfeited, and no bar to the original cause of action. 16 Ves. 374.

It will be necessary to examine whether any question is raised to which the principle can be applied. We have seen there is no evidence sustaining the claim for thirty per cent. on the seven thousand one hundred and forty-one dollars forty-two cents, adjusted by the composition; but it is also insisted by the answer; that if White failed to pay punctually for the goods purchased from C. and B. in 1832, he then contracted to pay five per cent. in addition, on the invoice in liquidation of which the notes were given.

The averment is, independent of any allegation in the bill, very improbable in itself, and not sustained by the slightest proof. We take it, therefore, no such agreement was made.

At the time the goods were delivered, through inadvertence, one dollar forty-one cents remained due to Clarke and Briscoe. When White discovered it, he offered to pay the amount, which the respon-

dents refused to receive. The fact is set forth in the bill, h noticed in the answer. If, however, an issue had been taken upon it, we think the mistake of a character too trivial to deserve notice: the defendants disregarded it when the goods were in a course of delivery, and admitted the contract of composition, to the amount of seventy cents in the dollar, to be discharged: and so this Court holds.

White's compliance will, therefore, bear the test of all the legal strictness, supposed in argument to apply in cases of performing contracts of composition.

Fifth and sixth, it is insisted:

" There is no evidence in the cause competent and sufficient to overrule so much of the answer as denies the agreement for composition, alleged in the bill; and avers a materially different agreement."

" Taking the terms of the composition to be such as the answer avers and puts in the place of wna it denies, there appears a still more important, palpable, and fatal breach of its terms on the part of complainant."

We reply, that the evidence is competent, and amply sufficient to overrule the parts of the answer responsive to the bill; and that the terms of the composition were not such as the answer avers.

Seventh, it is insisted:

" The actual frauds which the answer charges, in the elaboration of the scheme of artificial and feigned failure and insolvency, for defrauding the creditors of their dues, and overreaching them with unfair compositions, under deceitful pretexts, are fully made out in proof; and are sufficient, and more than sufficient, to set aside the complainant's composition with the defendants, and every composition with his other creditors."

This being the ground upon which most reliance was placed to make out the defence, it is due to the argument that we examine the point in the form it has been presented for the appellants; and consequently, that some attention be bestowed on the evidence tending to prove fraudulent conduct in the appellee, without nicely discriminating how far it applies to the cause made by the pleadings. It is contended, that the correspondence, the attempts at composition with the Baltimore merchants, and the agreements with them and others, furnish evidence of a fraudulent intent in the appellee to alarm and overreach his creditors generally, thereby to draw them into com-

positions at low rates, by deceitful pretexts: which position, it is assumed, is fully made out in proof: and that the appellants were victims to the common fraud and subterfuge is a fair inference; at all events, if actual fraud does not appear, that it is evident the complainant did not come into Court with an unaffected conscience; in which case he cannot call upon the active power of the Court for relief; that, in the phrase of early times, the complainant must come into equity with clean hands.

If any deception was practised whereby the appellants were drawn into a losing bargain, and a sacrifice of thirty per cent. of their just demand; the Court could not, consistently with the principle referred to, afford its active aid to the complainant. But, if it be assumed that a court of equity can refuse relief because the complainant, in settling with other creditors, imposed on them, and hence his conscience is affected, the assumption must be rejected as unsound. Such extraneous dealings are not within the issue, and do not belong to the cause, further than they can be connected with the transaction as evidence of a connected system of fraud, to produce alarm and action on the part of these particular creditors.

To press further the principle, that a complainant must come into a court of equity, when he asks its aid, with a clear conscience; would be assuming an unlimited and undefined discretion to dismiss the bill, not for want of equity in the allegations and corresponding proof, but because of the bad conduct in life and character of the complainant.

The true rule is: " If the person against whom fraud is alleged, should be proved to have been guilty of it in any number of instances; still, if the particular act sought to be avoided, be not shown to be tainted with fraud, it cannot be affected with the other frauds; unless in some way or other it be connected with or form a part of them." Conard v. Nicoll, 4 Peters, 297.

Testing the force and effect of the evidence, with this explanation of the rule, in virtue of which it is sought to give it effect; and what does it establish? For years before the fall of 1833, when the transactions we are investigating took place, the complainant, White, had been a retail dry goods' merchant in Washington city, of reputed opulence, and decidedly good credit. In 1833, the city business was depressed, and the sales reduced, compared with former years; the retailers generally bought light stocks for the fall trade, predicting pressure in the money market, and difficult times. White, on the contrary, purchased much larger than usual, asserting it as his opinion,

[Clarke et al. v White.]

that trade would assume its usual vigour, and that the ordinary quantity of goods would be needed during the then approaching long session of congress: his fall purchases amounted to near thirty-four thousand dollars, and added to those of the spring made forty-seven thousand eight hundred and fifty-seven dollars. In the previous year (1832) he had purchased thirty-three thousand eight hundred and ninety-two dollars' worth of goods for his stores; having one in Georgetown also. It is insisted that these large purchases were made with a prospective view to a failure, and compositions at thirty and fifty per cent. discount; the complainant at the same time being perfectly solvent in fact. That purchasing largely was an elaborated scheme, with a view to future and feigned insolvency, designed, on the part of White, to overreach his creditors, it is difficult to believe. His exertions to maintain his credit after his first notes were dishonoured, and to quiet the Baltimore creditors, whose suspicions had been awakened from his heavy purchases in September, could not well have been more earnest, active or ingenious; and this, up to the time when the Baltimore creditors, by a bill of injunction, restrained complainant from proceeding in his business; and which prostrated his credit and character to such a degree as to render a failure inevitable had the means of payment been ample as they are asserted to have been.

It is probable that the appellant was insolvent, and knew the fact to be so when he made the fall purchases of 1833; and that he incurred the dangerous risk of so large an overtrading in the hope that chance and a desperate effort might save him: that if he must fail, it would not be material for what amount he failed, if he had the goods on hand, or their proceeds, should they be sold when the event happened. This certainly was bad faith, if true, in reference to the creditors from whom the stock of goods, for 1833, had been purchased; but how it could affect the respondents, who had the previous year trusted White, on long credits, cannot be perceived; they received payment out of the goods thus obtained to the amount of seventy per cent.; and in this aspect of the alleged fraud, by complainant on the wholesale dealers, the appellants surely have no just grounds to complain.

But the merits of the defence, it is earnestly urged, rest on the question whether the appellee was solvent and able to pay his whole debts at the date of the composition and contract to take a part. On this head the evidence is tolerably satisfactory: an account of White's

means and liabilities was demanded of him by the Baltimore creditors as early as the 3d of December, 1833, which was furnished, and is no doubt substantially correct; at least so the creditors treated it, and nothing is found in the record to disprove the statement. That he owed the debts there set forth is certain; and that he had the means to meet them is very improbable, as the creditors instituted and exercised a scrutiny not likely to overlook secreted property: and money, there can be no doubt, there was none, for the complainant, in good faith, seems to have discharged many of his bank debts, with others, to the extent of all the cash he could command, amounting to twelve thousand dollars, during the months of October and November, 1833.

This brings us to the debts and means of payment. On the 3d of December, the complainant owed in Baltimore fifteen thousand one hundred and fifty-five dollars; in Philadelphia fourteen thousand four hundred and sixteen; in New York ten thousand seven hundred and sixty-four; and in Washington city nine thousand two hundred and fifty-one; in all forty-nine thousand five hundred and eighty-six dollars.

The means of payment were the stocks of goods in Washington and Georgetown, twenty-six thousand five hundred dollars; good debts, two thousand four hundred and forty-six; doubtful debts, two thousand five hundred and thirty-three: the aggregate of active means thirty-one thousand four hundred and forty-nine dollars.

Real estate four thousand dollars; household furniture one thousand seven hundred and fifty; these items added to the goods and debts, make thirty-seven thousand two hundred and twenty-nine dollars' worth of property.

Then there were exhibited bad debts, due to the complainant, amount, ten thousand one hundred and sixty-five dollars. On these desperate debts no business man could place any reliance; and they are, therefore, disregarded by the Court when estimating the available property of the appellee: and the same might, with something of safety, be assumed of the item consisting of household goods; the idea that the wealthy wholesale dealer will strip the family of his unfortunate retail customer, of their beds, furniture, and utensils, has no place in the mercantile transactions of this country. Retaining this item, however, and the complainant had twenty-five per cent. less property than the amount of the demands against him; and of course could not have paid more than seventy-five per cent. The fourth of

forty-nine thousand five hundred and eighty-six dollars, (the aggregate of the debts,) is twelve thousand three hundred and ninety-six; the property in hand (thirty-seven thousand two hundred and twenty-nine dollars) deducted from the indebtment, shows an excess of debts over means of twelve thousand three hundred and fifty-seven dollars.

This state of facts had been exposed to the creditors of the appellee, on the 3d. of December; and Clarke and Briscoe applied for an adjustment, on the 29th of the month: of course, they were familiar with it; they made no inquiry for information, and no demand for more than seventy per cent.

The notes of appellants were not due, and they were obviously and very justly impressed with the belief, that the debt would be lost if White did not compound it; he was urged by them to deliver goods to cover seventy per cent.; this he at first declined, and offered sixty; but, on being reminded that others had received payment at the rate of seventy per cent., he, with obvious reluctance, assented.

But more than seventy per cent. was received by Clarke & Briscoe, because their notes were not then due. They pressed the debtor to the highest rate of composition he was able to pay, consistently with his duty to the other creditors; and, considering the nature of his means, and that he discharged this demand with the most available means, it was probable that equal justice could not be done to others.

These prominent and controlling facts repel the idea of a feigned insolvency; or that that the appellants were overreached by deceitful devices.

The evidence tending to prove unfair conduct on the part of the appellee, in reference to his creditors in Baltimore, &c. had little influence on the appellants, as we apprehend; how far it extended, it is difficult to ascertain. Be this however, as it may, they having received their full proportion of the appellee's property, have no right to resist the prayer for relief, even had the composition been made in subservience to an unfair but extraneous influence, growing out of the transactions with the other creditors, who were separately seeking payment. In equity, as at law, fraud and injury must concur to furnish ground for judicial action; a mere fraudulent intent, unaccompanied by any injurious act, is not the subject of judicial cognizance. Truly, there are strong grounds of suspicion; but fraud ought not to be conceived; it must be proved, and expressly found. Conard v. Nicoll, 4 Peters, 297; United States v. Arredondo, 6 Peters, 716.

Again, it is contended that the appellants did not receive their due proportion of the means of payment at the appellee's command, when the composition was made; because he held a lot with valuable improvements thereon, in Washington city, in the name of his brother, by a conveyance purporting to be in trust for appellee's three infant children; which deed, it is insisted, is pretence, covinous and void, both in law and fact, in so far as it affects the appellants and other creditors: that being thus void, it furnishes almost conclusive evidence of an intended fictitious failure, at the time the goods were purchased from the appellants, in 1832, and for which the notes sought to be injoined were given.

Much stress has been laid upon this transaction, as somewhat of an independent ground of defence in the pleadings, and also in the arguments presented for the appellants; we therefore deem it a duty to bestow upon this particular question, a corresponding degree of attention.

The facts it rests upon, appear by the trust deed, and the deposition of the grantor, John A. Smith.

The lot was formerly the property of Daniel Brent, and was sold early in 1829, as part of his property, by John A. Smith, appointed trustee of Brent's estate, under an insolvent act; at which sale, William G. W. White became the purchaser, at the price of one thousand five hundred and thirty-two dollars and thirty-four cents, on a credit of one, two and three years; the lot being sold at auction for a full price, and the sale notes paid at maturity, no doubt exists of the appellee's former equity therein. He took possession immediately after the purchase in 1829, and commenced improving by erecting buildings thereon; the lot having been vacant at the date of the purchase.

On the 14th of January, 1832, John A. Smith, at the request of William G. W. White, conveyed the premises to James L. White, in trust for the three infant children of William G. W. White, in fee. Between the date of the purchase in 1829, and that of the conveyance in January, 1832, William G. W. White made improvements on the premises, to the value of about three thousand dollars; and added to them others, costing twelve or fifteen hundred dollars, after the date of the deed, and before his failure in December, 1833. The property, at this date, was worth about six thousand dollars.

Another attendant circumstance is strongly relied on, to show the fraudulent intent of the appellee. The deed of the 14th of January,

1832, was not delivered to the clerk to be recorded, until the 13th day of July thereafter, and within one day of the expiration of the time prescribed for such delivery, by the statute of Maryland, which is six months; and the notes sought to be surrendered, are dated the 2d of July, 1832.

In reference to this conveyance it may be remarked, that by the common law, it was valid without registration; and where register acts require deeds to be recorded, they are valid until the time prescribed by the statute has expired; and if recorded within the time, are as effectual from the date of execution, as if no register act existed. The deed from Smith to James L. White is, therefore, unimpeachable, for the reason that it was delivered for registration on the last day of the six months; nor is fraud predicable of the mere circumstance of non-registry, as against William G. W White, who was not the grantee, nor entitled to the possession of the deed. How far fraud in fact might be inferred from not putting the deed of record, taken in connection with other circumstances, is a question involving the rights of third persons not before the Court; and which we do not take into consideration, further than to ascertain whether the appellee used the deed as a means of deception in the transaction before us. If White represented the property as not belonging to him, and settled with his creditors on this basis, when it did belong to him; the question then is, can the appellants reverse the decree and dismiss the bill, and be let in at law upon the property; and this presents another aspect of the effect of the conveyance: as a legal title, it is not open to imputation; William G. W. White never had any estate in the premises recognised at law, or subject to execution; the title passed directly from Smith to James L. White: consequently, if the deed were pronounced void, the title would be adjudged in Smith: it is one of those conveyances, where there was clearly a bona fide grantor, and which is not within the statutes against fraudulent conveyances; as was holden in M'Niel v. Brooks, in 1 Yerger's T. Rep. 73; which case followed that of Crisp v. Pratt, in Croke, 548. If the conveyance is open to imputation, it is so at common law, and because of fraud in fact; and involves substantially the same inquiries that did the case in this Court, of Sexton v. Wheaton, 8 Wheat.; and Hinde's Lessee v. Longworth, 11 Wheat. We will not say but that on a proper case being made, and fraud in fact proved to have been the moving cause of ordering to be vested in trust the premises in the name of the appellee's brother, that the

[Clarke et al. v. White.]

latter we ald not be decreed to hold as trustee for the creditors of William G. W. White, he having paid the consideration; but then the property would be treated and applied as a trust fund, and be so declared in equity, on the sole ground that the transaction was fraudulent in fact. No case is before us fairly to raise such a question, or to justify speculations affecting injuriously a title valid at law, and prima facie good in equity; when those most interested in it are not before the Court.

There is another reason why the appellants cannot challenge the validity of the title made by Smith to James L. White; it is this: they made the composition with a full and perfect knowledge of the facts attending the conveyance, and subsequent improvements of the property; then they continued silent, and took the full benefit of their contract, and cannot now be heard to speak. He who purchases unsound property, with knowledge of the unsoundness at the time, cannot maintain an action. So if one compounds a debt, or makes any other contract, with a full knowledge of all the facts, acting at arm's length upon his judgment, and fails to guard against loss; he must abide the consequences. Neither fraud nor mistake can be imputed to such an agreement.

Eighth, it is contended:

The inequality alone in his various compositions with his creditors, (all the other circumstances of fraud being out of the question,) is a fraud, per se, both at law and equity; and sufficient of itself either at law or equity, to vitiate and set aside each and every of the compositions, from the lowest to the highest.

If upon failure or insolvency, one creditor goes into a contract of general composition common to the others, at the same time having an underhand agreement with the debtor to receive a larger per cent., such agreement is fraudulent and void; and cannot be enforced against the debtor, or any surety to it. 1 Story, 371. The doctrine was carried so far in the court of exchequer in England, some years since, as to extend the principle to a case where the creditors made separate contracts with the debtors, but with an understanding that two shillings and sixpence in the pound was to be paid; and one of the creditors got a secret bond, fraudulently intending to induce others to enter into the composition, and the bond was relieved against. Fowett v. Gee, 3 Anstruther, 910. Although this case, and Spooner v. Whitsan, 8 Moore, 580, in the common pleas, have been adduced to the Court, as varying the general principle, on examination of

[Clarke et al. v. White.]

them, we think they proceed upon it; and the case in Anstruther presses the principle very far against the creditor: however they might be, no great stress could be laid on them by the Court; and the same may be said of Small v. Brackley, 2 Ves. 602, cited by the appellants' counsel.

The rule cutting off underhand agreements in cases of joint and general compositions, as a fraud upon the other compounding creditors, and because such agreements are subversive of sound morals and public policy, has no application to a case like the present; where each creditor acts not only for himself, but in opposition to every other creditor, all equally relying upon their vigilance to gain a priority; which, if obtained, each being entitled to have satisfaction, the payment cannot be questioned. The debtor may prefer one creditor, pay him fully, and exhaust his whole property, leaving nothing for others equally meritorious. Yet their case is not remedial: and why may not debts be partially paid in unequal amounts? If those who receive partial payments are willing to give releases, it is their own matter; and, should a third person interfere, debtor and creditor could well say to him, you are a stranger, and must stand aside.

The case of the appellee presented a fair instance of the propriety of paying some of his debts fully, and others partially. He owed bank debts, secured by the endorsements of friends, whose kindness was the only motive to incur the liability; to relieve whom he did pay, and ought to have paid, large sums during October and November, 1833.

The notes passed off to Clagett and Washington were transferred before maturity, and before the contract of composition took place; and of course their right was not affected by it. As to them, the decree dismissing the bill was proper; as it is in all other respects, and must be affirmed.

Mr. Justice BALDWIN dissented.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel. On consideration whereof, it is decreed and ordered by this Court, that the decree of the said circuit court in this cause be, and the same is hereby affirmed, with costs.