HERRING, Assignee, etc., *v.* RICHARDS and others.

*(District Court, D. Minnesota.* February, 1880.)

1. VOLUNTARY CONVEYANCE—PARENT AND CHILD—FRAUD.—A voluntary conveyance from a parent to his children, by way of settlement, while solvent and free from debt, and not disproportionate to his means, will be sustained, as against subsequent creditors, in the absence of fraud.

2. SAME—SUBSEQUENT IMPROVEMENTS—FRAUD.—Subsequent contributions of money, for the purpose of paying off encumbrances and improving the property, will not render such conveyance void.

3. SAME—PRESUMPTION OF ACCEPTANCE.—In the absence of direct testimony the acceptance of the grant will be presumed, after the expiration of four years, where the grantees held, owned, controlled, and managed the property from the time of the conveyance, and the only occupancy had been by their tenants, and for their sole and exclusive use.

*H. P. Herring,* for plaintiff.

*George B. Young,* for defendant.

NELSON, D. J. This suit is brought to recover certain real property alleged to have been conveyed in fraud of creditors.

On August 12, 1874, William Richards purchased of Aaron S. Everest and wife the property in controversy, and received a deed therefor, which was recorded August 15, 1874. The purchase price was $2,000, and Richards paid $200 in cash, and gave his notes and a mortgage to secure the balance of the purchase money. The notes were four in number, viz.: One for $300, due August 12, 1875; one for $500, due August 12, 1876; one for $500, due August 12, 1877; one for $500, due August 12, 1878.

On August 14, 1874, Richards conveyed the farm for a consideration, expressed in the deed, of $200, to his daughters, Minnie Richards and Mary Vine Richards, now Mary

Vine French, wife of the defendant Lafayette French. It is admitted this conveyance was voluntary, and subject to the mortgage.

At the time of this conveyance to the children, Richards was engaged in the lumbering business, owning an interest in lumber yards at Austin and Minneapolis, and connected with Bray & French and his son, William A. Richards, and subsequently with Bray, Wilder & Co., the successors of Richards, Bray & French, at Minneapolis. The aggregate interest of Richards in the business was sworn to by competent witnesses as amounting to over $7,000; and at that time Richards also owned real estate in Austin, valued at over $8,000, out of which there was a rental, in 1874, of $1,455, and a trifle less in 1875 and 1876, and on which was an encumbrance of only $500. Richards' profits or income, for 1874, amounted to $2,436.15, from his lumber trade, in addition to the rental above stated. He owed some debts in his business, but his property interest was fairly worth, according to the balance sheet and other testimony, $8,000 in the lumber business, over and above his liabilities, and $8,000 in real estate at Austin, encumbered to the amount of $500.

There is no evidence that Richards' estate was less during the year of 1874, but it was ascertained on January 1, 1876, Richards had lost, during the year 1875, about $6,000; and, heavy losses following, he became insolvent, and in October, 1877, was adjudged a bankrupt.

The assignee insists that the conveyance to his children by Richards was in fraud of subsequent creditors. The land conveyed was subject to the mortgage to secure $1,800, the balance of the purchase price agreed to be paid Everest, and at the time of Richards' bankruptcy all but the last note of $500 had been paid. The land was improved every year by plowing and breaking up additional acres, fencing, etc., and it is urged that the testimony shows the money expended in improvements belonged to the bankrupt Richards. I do not find such to be the case. An analysis of the evidence shows the following amount of money was laid out in improvements and necessary expenses, and the sources from which it came:

ANALYSIS OF PAYMENTS EACH YEAR, SHOWING BY WHOM MADE.

| | | | |
|---|---|---|---|
| **1874-5**—Total expended on farm......... | $1,346 49 | | |
| Furnished by Mrs. Richards...... | 649 81 | | |
| Paid by Richards................. | $ 696 68 | $ 696 68 | |
| Received by Richards from farm. | | | $ 341 50 |
| **1876**—Total expended on farm........... | 2,344 46 | | |
| Furnished by Mrs. Richards........ | 467 83 | | |
| Furnished by Richards............. | $1,876 63 | 1,876 63 | |
| Received by Richards from farm.... | | | 2,281 00 |
| **1877**—Expended on farm..... $1,875 34 ⎱ | | 1,875 64 | 2,777 97 |
| Received from farm... 2,777 97 ⎰ | | | |
| | | $4,448 95 | $5,400 47 |

| | | | |
|---|---|---|---|
| **In 1874-5** Richards laid out........... ... | $ 696 68 | | |
| Richards received............. | 341 50 | | |
| Farm debtor to Richards........ | $ 355 18 | $ 355 18 | |
| **In 1876** Richards laid out................. | 1,876 63 | | |
| Richards received................. | 2,281 00 | | |
| Richards debtor to farm.......... | $ 404 37 | | $ 404 37 |
| **In 1877** Richards laid out................. | 1,875 64 | | |
| Richards received................. | 2,777 97 | | |
| Richards debtor to farm......... | $ 902 33 | | 902 33 |
| Balance Richards debtor to farm. | | 951 52 | |
| | | $1,306 70 | $1,306 70 |

MONEY AND LUMBER FURNISHED FOR FARM BY MRS. RICHARDS, OUT OF HER SEPARATE PROPERTY.

| | | | |
|---|---|---|---|
| **1875**—July 6. | Money to pay Ernest on $300 note............. | $ 331 25 |
| Sept 9. | Lumber, $185.58; cash, $95.43.................. | 281 01 |
| 20. | Cash to pay Cochran ........................ | 37 55 |
| | Total in 1875 ................................. | $ 649 81 |
| **1876**—March 11. | Lumber for stable ........................... | 114 66 |
| 18. | Paid for nails, $6.50; barley, $36............. | 42 50 |
| 24. | Paid seed wheat............................. | 204 30 |
| 28. | Paid red-top seed and clover seed...., ...... | 12 57 |
| 31. | For work in building stable.................. | 40 00 |
| June 9. | Lumber...................................... | 53 89 |
| | Total in 1876................................. | $ 467 83 |
| | Add amount in 1875, as above............... | 649 81 |
| | Total amount paid by Mrs. Richards......... | $1,117 64 |

| FARM ACCOUNT, 1877. | *Dr.* | *Cr.* |
|---|---|---|
| April. Expenses putting in crop—Paid Wm. Way, Vincent & Gallagher, and Norwegian and team, as per time book................... | $ 120 12 | |
| July 19, and part of August. For harvesting and stacking, to Wm. Way, superintending... | 50 00 | |
| Aug. 23. J. Frost and J. Owens and hands......... | 78 00 | |
| Dickinson and teams..................... | 25 00 | |
| For wire............................. | 50 50 | |
| Paid for threshing 2,792 bushels wheat... | 139 60 | |
| Paid for help, by order from Wm. Way, as per time book— | | |
| For teams............................. | 49 50 | |
| Men to help threshing.................. | 41 25 | |
| 31. Paid Everest two notes and interest, at Mower County Bank.................. | 1,126 67 | |
| Nov. 1. Wm. Way and teams, plowing 130 acres. | 195 00 | |
| July 23. Sold 10 tons hay, @ $5 .................. | | $ 50 00 |
| Aug. 24. Sold 2,807½ bushels wheat, @ 88 cents... | | 2,470 60 |
| Hay—seven tons to Decker.......... | | 35 00 |
| Sept. 12. Hay—13 tons in stack.............. | | 65 00 |
| Oct. 30. 174 bushels wheat, @ 88½ cents, from land worked by O. Smith, on shares. | | 157 37 |
| | $1,875 64 | $2,777 97 |

It appears from the foregoing schedule, which is sustained by the evidence, that the notes given by Richards in part payment of the property were not paid by him out of money belonging to his estate, but by Mrs. Richards, out of her own money and the proceeds of the farm.

It appears that a small amount, in addition to the first payment of $200, made by Richards, was laid out by him upon the farm, but I do not think the sum can be regarded so large a settlement upon his children as to make void the conveyance. If it was made in good faith, with no intent to defraud creditors, it will not be set aside, when it is in proof that at the time Richards made it he possessed ample means to pay his debts, unless the business in which he was engaged, or intended to engage, was so hazardous, and required such large pecuniary liability, that he could not reasonably believe the gift would not imperil his ability to meet his debts, to be contracted in the future.

It is not proved such was the case. The conveyance was

openly made, and the deed was recorded, and subsequent creditors had notice that the property was in the name of the children. They cannot be heard to say that credit was given Richards on the strength of his ownership of this land. If the conveyance had been secret, concealed from creditors, and the amount of the gift impaired the ability of Richards to pay, the creditors might complain.

I think it is proven that the gift was accepted by the daughters, and the following legal propositions must control the decision of this case:

*First.* Unless fraud was intended, when the conveyance was made by the father to his children, it is not void or voidable as to his subsequent creditors, inasmuch as he was free from debt at the time it was made. 8 Wheat. 239, and note to same case in 1 Am. Lead. Cases; 2 Kent's Com. 173; 3 John Ch. 481; Id. 328.

*Second.* Such settlement, though voluntarily made, will be upheld. *Ellison* v. *Ellison,* 1 Lead. Cases in Equity, 382.

*Third.* There is no presumption of constructive fraud by such settlement, as there might be if debts existed and the debtor impaired the rights of creditors. *Kehr* v. *Smith,* 20 Wall. 31, 35.

The rule may be summed up that the gift, conveyance, and settlement will be upheld "if it be reasonable, not disproportionate to the husband's means, taking into view his debts and situation, and clear of any intent, actual or constructive, to defraud creditors." This doctrine is solid.

A fraudulent intent must be clearly shown, but if the amount of the property thus conveyed impaired the means of the grantor, so as to hinder and delay his creditors, it is void.

If an honest motive can be imputed to the donor, equally as well as a corrupt one, the former should be preferred.

If this case is tested by the rules above laid down, I think the conveyance can be sustained, for the intent to defraud creditors is not clearly and distinctly proved. There is some conflict in the testimony upon this point, but the plaintiff, upon whom the burden of proof is thrown to show the fraudulent intent, has failed to prove it.

In addition to the business of buying and selling lumber, Richards, about 1875, before his bankruptcy, with associates, built a saw-mill, which burned down a short time after it commenced work. This misfortune impaired, to some extent, his ability to meet his debts and pay losses, for, in order to obtain the means required to put into this enterprise, he mortgaged a part of his property, and after the fire borrowed money, and gave mortgage security therefor, to pay the losses. There is no evidence, however, to show that Richards, at the time he gave his daughters the land, or at the time he invested a small sum in improvements thereon, contemplated the erection of a mill, or engaging in such enterprise, and although I take into account the pecuniary condition of Richards during the entire period of time when these several gifts were made, the nature of this particular enterprise cannot be considered, for he did not intend at the time to embark in it.

The volume of testimony is so great that I can only briefly elaborate the facts. I have done this so far as it was necessary to apply the rules which must govern the decision.

There is nothing in the case which, to my mind, brands the conveyance as absolutely void or voidable, as no actual fraudulent intent, on the part of Richards, is shown when he made the gift.

The amount laid out by Richards did not impair his estate to such an extent as to be a fraud upon subsequent creditors, and under the circumstances the conveyance is not illegal and void.

A decree will be entered dismissing the bill.

––––––––

*(Circuit Court, D. Minnesota. June, 1880.)*

APPEAL FROM DISTRICT COURT.

McCRARY, C. J. The facts are fully and accurately stated in the opinion of the district judge, which is given above, and it is therefore only necessary that I should state my conclusions:

*First.* At the time Richards purchased the farm in con-

troversy, and at the time he conveyed it to his daughters, he was solvent, and not indebted, and the property thus settled upon his daughters was no more than a reasonable provision for them, not disproportionate to his means, taking into view his situation.

*Second.* The proof does not establish the allegation of the complainant that the conveyance to the daughters was made with intent to defraud subsequent creditors.

*Third.* The assignee insists that Richards furnished the money used in improving the farm, and in paying off encumbrances, after the title had been vested in his daughters. The weight of evidence is against this claim, as is clearly shown by the opinion of the district judge. Suppose, however, Richards did furnish money to his daughters, or use money for their benefit in the way suggested, would that fact render invalid the original conveyance from him to his daughters? If that conveyance was in itself *bona fide*, free from fraud, and in all respects valid, a subsequent contribution by the father, for the purposes named, would not change its character. The fact of the making of such contributions would be evidence tending to show fraud in the original transfer, but not by any means conclusive. If the original conveyance was made in good faith, while the grantor was solvent and free from debt, it was valid and must stand, even though other property may have been fraudulently given or conveyed to the same parties at a subsequent period. In such a case the remedy would not be by a bill to set aside the original conveyance, but by proper proceedings to recover the property subsequently transferred. Thus, in *Clarke* v. *White*, 12 Pet. 178, the supreme court say: "If the person against whom fraud is alleged should be proved to have been guilty of it in any number of instances, still, if the particular act sought to be avoided be not shown to be tainted with fraud, it cannot be affected with the other frauds, unless in some way or other it be connected with or form a part of them." Page 194.

*Fourth.* It appears that Mr. Richards, the grantor, after executing the deed to his daughters, took the same to the re-

corder's office and filed it for record. There is no direct testimony to show either that the grantees did or did not, at the time, have knowledge of and assent to the grant.

Whether they assented to the grant at the time, or subsequently, or not at all, is left to inference. If, therefore, the presumption of the law is that the grant was accepted by the grantees, that presumption must prevail. If the presumption is the other way, and the burden is upon the defendants to prove delivery to them, or something equivalent thereto, the conclusion must follow that plaintiff should recover, since no such affirmative proof is to be found in the record.

There are numerous cases which hold that the execution of a deed or mortgage, and the delivery of the same to the recorder for record, *without the knowledge or assent of the grantee or mortgagee*, will not avail as against an attaching or execution creditor of the grantor. *Day* v. *Griffith*, 15 Iowa, 104; 4 Greenleaf's Cruise on Real Property, p. 12, note, and p. 13, note 1; *Samson* v. *Thornton*, 3 Met. 275; *Denton* v. *Perry*, 5 Vt. 382; *Cobb* v. *Chase*, 6 N. W. Rep. 264.

But the present case does not come within the principle established by these authorities.

Whether the plaintiff can be regarded as standing in the same position as an attaching or execution creditor is immaterial, since it does not appear either that the defendants were ignorant of the conveyance when made, or that they did not at any time assent to or accept it before the bringing of this suit. One or the other must be shown. If the recording of the deed is intended as a delivery, and is known to the grantee, and he assents to the same, it will take effect. 2 Washburn on Real Property, pp. 580, 581. The acceptance of the grantee will be presumed in such a case, if the deed be upon its face beneficial to him, and the circumstances are such as to warrant the conclusion that the grantor intended the delivery to the recorder to be for the use and benefit of the grantee, especially if the latter claims under it. 4 Greenleaf's Cruise, 12.

Again, the authorities are abundant in support of the proposition that the grantee in a deed executed and delivered to

a third party, though ignorant of the conveyance when made, may subsequently accept it, and his title will relate back to the date of the conveyance, unless an intervening levy of attachment or execution may have defeated it. *Harrison* v. *Trustees, etc.,* 12 Mass. 456; *Hatch* v. *Hatch,* 9 Mass. 307; *Foster* v. *Mansfield,* 3 Met. 412; *Doe* v. *Knight,* 5 Barn. & Cros. 632, (671;) *Hedge* v. *Drew,* 12 Pick. 141.

We cannot in this case presume, in the absence of proof, that defendants, at no time during nearly four years that elapsed between the conveyance to them and the commencement of this suit, were made aware of, and assented to and accepted, the grant. Especially is this the case, in view of the allegation in the answer that the defendants have held, owned, controlled, and managed the farm ever since the conveyance, and that the only occupancy has been by their tenants, and for their sole and exclusive use. This is equivalent to an allegation that the conveyance was accepted by the grantees when made, and it must be overcome by proof on the part of plaintiff.

The decree of the district court, dismissing the bill, is affirmed.