Mr. Justice Scott delivered the opinion of the court. In this case but a single question is presented, and that is, whether or not the complainant below was entitled to be heard at all in a court of equity. Beyond this his case is clear enough. It is insisted that he had committed iniquity and therefore that the door of the court ought to have been closed against him and' the Chancellor’s ears deaf to his complaint. The rule, the application of which by the appellant is thus invoked, is but the converse of that other maxim ; “ he who will •have equity done to him must do equity,” and this has its foundation laid in the first principles of natural justice, being the cardinal point of duty to our neighbor recognized as such by the high authority of Revelation. Nor is the rule that turns the unjust suitor from a court of equity unknown to the courts of law, as it is a maxim there that, where the parties are equally culpable or criminal, the defendant must prevail. And therefore, as in equity, the iniquitous plaintiff cannot have the aid of the court, both the law and the equity maxims are brought to the same point. But although this doctrine is of general, it is by no means of universal application. For, besides the admitted and well established exception of that class of cases where the agreement or other transactions are repudiated on account of their being against public policy, (where the relief is said to be given, not to the parliceps criminis, but to the public through him, because of the duty of the court to uphold and maintain the laws and prevent their infraction. 1 S.ory Eq. sec. 289. Tucker, 2 Lee. 393. 1 Rand. 76,) there are many anomalous cases, not impugning the general principle, but supposed to be placed beyond its influence by the particular circumstances of the case; as where the party has been seduced from the path of rectitude by the allurements of strong circumstances and by these means been made in some sense the slave of another’s will; the law,in compassion of the infirmities of his nature, has supposed that he did not enjoy that freedom of will without which he cannot be justly regarded as a moral agent, (Austin's ad. vs. Winston's ex. 1 Hen. & Munf. 33,) or where the circumstances were such that the relief granted could be supposed to be, not the actual enforcement of the fraudulent or illegal contract, but simply a suit brought for the recovery of money received by the defendant for the plaintiff though founded upon a transaction originally fraudulent or illegal, as in the case of Anderson & Tilly vs. Moncrief, (3 Desseau 133,) where the agent had received a consignment of Africans with instructions to sell them, and, having effected the sale, refused to account and pay over the proceeds on the ground that the act which had brought the money into his hands was a direct violation of the laws against the slave trade. With the exception pointed out however and of these anomalous cases, the doctrine is of very general application and is sustained by eminent authority as a remedy, that goes deep and cuts at the very root of the evil; and is supposed to be appropriate as it is but the refusing of the aid of the law to those who voluntarily enter into transactions dsicountenanced by it or beyond its pale. Not thereby creating rights in the wrong doer; for rights are out of the question; but simply permitting possession to stand for right and sustaining this possession by rendering the adversary incompetent to set up in a court of justice a scandalous pretension. In the case before us Reyburn suffered a judgment at law to go against him by default and went to the chancellor for relief against it by injunction. And Irons, unable to maintain any other defensive attitude, rests alone upon an assumed position that Reyburn, in the transaction out of which this controversy has arisen, perpetrated a fraud upon Glasgow, Harrison & Co. Now leaving out of view any analogy that this case may be supposed to bear,, in its facts and circumstances, to any of the anomalous cases alluded to, we will proceed to examine the testimony in reference to the alleged fraud upon the broadground assumed by Irons: bearing in mind the well established rule recognized by this court in the case of Dardenne vs. Hardwick, (4 Eng. 485) ; “ That fraud will never be presumed in a court of law although a somewhat different rule prevails in equity; but even there, where an act does not necessarily import fraud and may have as well occurred from a good as a bad motive, fraud will not be inferred.” The most prominent circumstance developed by the testimony, is a supposed concealment, both by suggestiofalsi and suppress™ veri, from Glasgow, Harrision & Co., by Reyburn of the partnership between him. and Irons. Harrison’s testimony gives most color to this allegation. His deposition was taken about seven years and a half after the transaction. He says that “ to the best ol his recollection” both Ileyburn and Irons informed him that the cattle had been purchased on joint account, that is to say, an undivided half of the drove had been purchased on account of Glasgow, Harrison & Co. by Reyburn as their agent and the other undivided half by Jones on his own account. There are two circumstances deposed to by different witnesses tending to show that in this Harrison may have been mistaken and that in truth and in fact Irons alone may have given him this information. The first is that testified to by Pereaw, to-wit: that after the cattle had been delivered and when the whole party were on their return home at the south fork of the Canadian about three miles from the depot where the cattle had been delivered, “that Irons in the presence of witness gave to Reyburn the receipt for the cattle that had been delivered to Harrison, and that Reyburn then told Irons that the receipt had been improperly drawn, and that it should have been drawn in his, Rey-burn’s name, whereupon Irons said it made no difference, as he, Reyburn, had the receipt and could draw the money and it all would be right.” The other circumstance is deposed to by Sweazy, which is, “that Irons,, on his return home from the Indian nation, told him (the witness) that he (Irons) had the advantage of Reyburn, for he had taken a receipt for the cattle purchased on the Arkansas river in his, Irons’, own name, although Reyburn had paid for them and that the reason that the receipt was drawn in his name was that he had delivered the cattle for Reyburn.” Concealment then by the suggestion of a falsehood by Rey-burn is by no means established. Was there any such by a suppression of the truth? There certainly was none to many of the witnesses; as the connection between Reyburn and Irons seems to have been often spoken of to them throughout the whole transaction. And there seems to have been no effort at concealment, on the part of Reyburn, from Governor Conway, who was one of the firm of Glasgow, Harrison & Co., and was the active member in setting on foot and carrying forward this agency; because he himself testifies that, when William Irons called on him for the money due for the purchase of cattle from him, Reyburn was in company and then produced the certificate in question and claimed it as belonging both to himself and Jonathan Irons, andón being paid a sufficient portion of it to discharge Jonathan Irons’ half of the note due to William Irons, he, Reyburn, endorsed a credit for that sum on the certificate. This occurred some two or three months after the cattle had been delivered, the receipt for which is the foundation of this controversy. And when it is remembered that this receipt showed upon its face, in express terms, that it was given for an undivided half of an entire drove of cattle delivered by Reyburn & Irons a.ndthe further fact is considered that Reyburn claimed to Conway a common orjoint interest with Irons in the certificate itself, although it was, in terms, given to Irons alone, and Conway,the active member of the firm in this transaction, recognized it by then paying over $517 on the certificate, and afterwards again recognized the transaction by paying off the certificare in full to Reyburn and taking it into his own hands, the inference is irresistible that Gov. Conway did not consider the transaction a fraud upon the firm of Glasgow, Harrison & Co. For if he had so considered it and, in consequence, had any thing to complain of or allege against Reyburn, it would seem that he would have at least demurred to the payment of so much of the amount of the certificate as would have been equal to a just and fair claim in the premises for reclamation. Then there would seem to be no ground for the suggestion that Reyburn had suppressed the truth from Conway in the matter of his partnership interest with Irons. And with regard to any ominous silence on the part of Reyburn to Harrison this would seem to be sufficiently accounted for by the facts that the agency had been set on foot by Conway; that it was to purchase cattle and deliver them in the Creek Nation; that Conway seems to have had the entire oversight oí it, as he gave instructions, was consulted when necessary, and paid out all the funds required, and that Harrison simply received the cattle from the hands of Reyburn. Under such circumstances, affording color for an inference that Reyburn felt himself peculiarly within the guidance of Conway and mainly accountable to him, there would scarcely seem to be just ground to impute fraudulent silence to him as to Harrison. The next most prominent circumstance which seems to afford any foundation for the inference of fraud is, that Reyburn, while the agent of Glasgow, Harrison 6s Co., for the purchase and delivery of cattle at their depot in the Creek Nation to supply Indian rations, should have purchased cattle for himself with his own means, drove them to that depot and there sold them to his principals. lío did not as their agent buy cattle for them from himself and thus play the inconsistent parts of both seller and buyer in the same contract of sale; but simply sold cattle to them which he had purchased with his own means during the time that he was their buying agent. Whether he was justified in doing so will depend upon the contract of hiring under which he served that firm. And the testimony is by no means explicit as to the exact scope and precise [limits of this, agency. Going however upon the presumption that, during the continuance of his agency, Reyburn would have no right to purchase cattle for himself with his own means, to be disposed of for his own profit, which is the strongest position that can be occupied for Irons in this case, we will proceed to examine into the facts and circumstances in proof to ascertain if there be any testimony tending to repel this presumption. There are two facts in proof which, although they do not come up to this point of inquiry, throw some light upon it by indirection: that is to say, the transaction of the purchase of William Irons’ stock of cattle and the delivery to Harrison of the joint purchase, the proceeds of the undivided half of which is the foundation of this controversy. Both of these tend to show» not that Reyburn was authorized to purchase cattle for himself, but that it was not inconsistent with the actual duties, of which he was in the performance, for him to purchase cattle for his principals in common or on joint account with a third person. That this mode of dealing was not in the first place expressly agreed upon or instructed is, in some sense, inferrable from the fact inproof, that Reyburn consulted with Conway before making for the firm the first joint purchase, the result of which consultation was express instruction thus to deal in the purchase of William Irons’ stock of cattle. Subsequently, when the drove of cattle was delivered, out of which this controversy has arisen, it does not appear from the testimony that Harrison made any objection. On the contrary, he received the undivided half that had been purchased for his firm and then agreed upon the price and bought the other undivided half. From the express instructions then of Conway as to the one purchase and the acquiescence of Harrison as to the other, it is fairly inferrable that this mode of dealing was not objectionable to the firm and that the paramount object of the agency was to effect certainty in the delivery of cattle at the depot, and that the price, within a reasonable range, was secondary to this object. So long as the agency was on foot, besides effecting these objects by direct means it also affected the market for cattle at the depot, in holding out to dealers that the firm was not entirely de-pendant upon casual droves for their supplies of cattle. Upon the basis of these facts and inferences then* is to be accounted for the circumstance that Conway in the one case instructed a joint mode of purchase, and in the other case that Harrison acquiesced in it. Indeed of so little value did this privilege of purchasing cattle jointly with the firm appear to be considered that it seems hardly to have been held as equivalent to the personal services of Jonathan Irons to be rendered'in and about the stock to be purchased from William Irons, as Reyburn was expressly instructed not to make the purchase of that stock, although considered a good bargain at the price, unless Jonathan Irons would join in the purchase, Gov. Conway seeming, from his deposition, to base his instruction mainly upon the fact, which he said he knew, that Jonathan Irons was “ a good hand to work with and manage that sort of stock.” It turned out however that in consequence of Irons being without means and without credit, Rey-burn found it impossible to carry out these instructions, and effect the object desired by his principals, otherwise than by becoming himself personally bound as the security of Jonathan Irons, which he did without reward of any character. Now when subsequently Reyburn, without express previous instructions, as in the last case, secured the personal services of the same man by giving him a like advantage in the purchase of another drove of cattle, and enabled him to purchase his undivided half, not by lending him his private credit as before, but by advancing for him out of his private purse sufficient ready cash upon the terms of reaping himself one half of the nett profits of that undivided half so purchased, can it be said to be by any means clear that Reyburn, in doing .so, was induced by a bad and fraudulent motive? On the contrary, may not his conduct be as well accounted for on the hypothesis of a disposition to serve his principals in this as in lending his private credit without reward? But the solution of the question whether or not there is any thing in proof to repel the presumption that Reyburn had no right to purchase cattle for himself, to be disposed of for his own profit, during the continuance of his agency, does not necessarily depend upon an answer to these queries that may be favorable to him, because there is another solution in his favor, altogether satisfactory, and that is in a fact already remarked upon while examining tire allegation of concealment. And that is, that subsequently, with a full knowledge of all the material facts of the transaction in which fraud is attempted to be imputed to him, Gov. Conway, after being expressly informed by the face of the certificate of the joint purchase and sale and being informed by Reyburn of his (Reyburn’s) individual interest in the certificate, recognized and ratified the whole transaction by paying to Reyburn in different payments the whole amount of the certificate. It having been declared daring the present term in the case of Lyon vs. Tams, that the legal effect of the subsequent ratification of a previous unauthorized act is precisely equivalent to a previous delegation of authority to do such act; the ratification relating back to the time of the inception of the transaction. Consequently Reyburn was in contemplation of law, by force of the ratification, authorized to do the act challenged as fraudulent, and it cannot now be called in question. And besides all this, not only has no complaint or exception against Reyburn been shown as at any time made by Glasgow, Harrison & Co., but no injury to them has been satisfactorily established; and in equity as well as at law fraud and injury must concurto furnish ground for judicial action : a mere fraudulent intent unaccompanied by any injurious actis not the subject of judicial cognizance ; and strong grounds of suspicion- are not sufficient, for fraud ought not to be conceived, but it ought to be proved and expressly found. Clark et al. vs. White, 12 Peters 196, citing 4 Peters 297 and 6 Peters 716. In the light of these views we entertain no doubt of Reyburn’s right to redress in a court of equity, and finding no error in the decree in his favor, it must in all things be affirmed. F. W & P. Trakíall, for the appellant, filed a petition for reconsideration which was overruled.