SMITH and others *v.* SCHWED and others.

(*Circuit Court, W. D. Missouri, W. D.* November, 1881.)

1. FRAUDULENT JUDGMENTS—EVIDENCE.

A transaction is admissible in evidence, if it can be connected with the transaction in controversy as part of a connected scheme to defraud.

2. SAME—BONA FIDE DEBT—DEFRAUDING OTHER CREDITORS—JUDGMENTS SET ASIDE.

If the purpose of a creditor in obtaining a judgment is not to collect his debt, but to help the debtor cover up his property, his judgment will be set aside, though it be shown that his debt was *bona fide.*

3. FEDERAL COURTS—IRREGULARITIES IN JUDGMENTS OF STATE COURTS.

A federal court will not set aside a judgment of a state court for a mere irregularity, when the proceeding is merely tantamount to the common-law practice of moving to set aside a judgment for irregularity, or to a writ of error, a bill of review, or an appeal.

4. REMOVAL OF CAUSES—SUBJECT-MATTER OF THE SUIT.

A bill in chancery that had been filed in a state court to enjoin a judgment creditor from proceeding to enforce his judgment, and to set it aside, was removed to a federal court. Prior thereto the complainants had brought and prosecuted to judgment attachment suits against the judgment debtor, and the property attached had been sold by order of court and the proceeds remained in the hands of the sheriff. The bill prayed for the payment of their judgments out of this fund. *Held,* that the fund in the hands of the sheriff was no part of the subject-matter of the suit which had been removed, and that the court had no control over it.

In Equity.

This is a bill in equity brought to set aside a judgment rendered in the circuit court of Jackson county, Missouri, on the twenty-sixth day of January, 1880, in favor of respondent Heller, and against respondents Schwed & Newhouse, for $9,512.50. The judgment was by confession, and it appears upon its face to have been upon a promissory note given by said Schwed & Newhouse to said Heller. The bill charges that the judgment was confessed without consideration, and by fraud and collusion, for the purpose of hindering, delaying, and defrauding creditors. Schwed & Newhouse were, for some time prior to the

rendition of said judgment, engaged in business as wholesale jewelers in Pittsburgh, Pennsylvania, and at Kansas City, Missouri. Their store at Kansas City was established as a branch of their business in Pittsburgh. In the course of their business they borrowed money, from time to time, from the respondent Heller, and made numerous payments on account of such loans; but whether, at the time the judgment was confessed, there was a balance due, as claimed by respondents in the case, is one of the questions in dispute. On the same day in which the said judgment in the circuit court of Jackson county, Missouri, was confessed, another judgment, for $5,009.33, was confessed by Schwed & Newhouse in favor of Heller, on another note, in the court of common pleas of Allegheny county, Pennsylvania. It appears that the alleged balance due from Schwed & Newhouse to Heller was divided into two notes,—one for $5,000, and the other for $9,000,—dated, respectively, December 22, 1879, and February 8, 1879, and each due one day after date, and on the former judgment was confessed in the Pennsylvania court, and upon the latter in the Missouri court. Executions were issued at once on both judgments, and the stores at Pittsburgh and Kansas City were simultaneously closed by the sheriffs.

Complainants, who are creditors of Schwed & Newhouse, instituted this suit in the state court to enjoin the execution of the judgment of the circuit court of Jackson county, Missouri, and to set the same aside as fraudulent. They also brought in the state court suit, by attachment, on their respective claims, and caused the Kansas City stock of jewelry to be attached. These attachment suits have been prosecuted to judgment in the state court. Since the institution of this suit the property attached (the stock of watches and jewelry) has been sold under an order of the state court, by the sheriff of Jackson county, Missouri, to one O. W. P. Bailey, who is made a party defendant herein, and the sum of $8,250 was realized therefor, which sum is now in the hands of said sheriff to abide the final result of this litigation. The complainants pray for decree to set aside said judgment as fraudulent and void, and also for distribution of the fund in the hands of the sheriff among the several judgment creditors of Schwed & Newhouse.

This case was removed from the state court on the ground of the citizenship of the parties. The further facts, so far as necessary to be considered, are stated in the opinion.

*Botsford & Williams* and *Scarrett & Riggins*, for complainants.

*Bryant & Holmes* and *Tichenor & Warner*, for respondents.

McCRARY, C. J. I will consider the several questions of law and fact in this case in the order in which they have been argued by counsel.

1. It is insisted on the part of the defence that proof of fraud in the confession of the judgment in Pennsylvania, and in the sale of the Pittsburgh stock under execution thereon, is not admissible to show fraud in the judgment in Missouri. The true rule upon this subject is this: It is not competent, for the purpose of showing fraud in a particular transaction, to show that the same party has been

guilty of fraud in another separate and independent transaction, not in any way connected with the matter in controversy. Courts will not go into such extraneous matters. But if the transaction sought to be shown in evidence can be connected with the transaction in controversy, as evidence of a connected scheme of fraud, it is admissible. *Clark* v. *White*, 12 Pet. 193.

Judged by this rule, I think the evidence tending to show fraud in the Pennsylvania transactions is admissible. The two transactions were manifestly but parts of one scheme; whether honest or fraudulent, is to be considered presently. They were between the same parties. The balance claimed by Heller as due him from Schwed & Newhouse was divided into two notes, and the collection of the sums due on said notes, respectively, was the ostensible purpose of the confession of the two judgments. They were rendered on the same day, and unquestionably in pursuance of an understanding between the parties. The two notes were, in fact, parts of the same debt. The two stores were branches of the same business, and the two judgments were, therefore, so connected together as to be justly regarded, for the purposes of this question, as parts of one transaction, to-wit, a scheme by which it was intended to procure judgments and executions in favor of Heller, and sell all the stock of Schwed & Newhouse, both in Kansas City and in Pittsburgh. There is also testimony tending to show that it was the purpose of the parties to prevent competition at both sales, so as to enable Heller to purchase the property for less than its value. Of this evidence I will speak in another connection. I mention it now only as bearing upon the question whether there was a connection between the transactions at Kansas City and Pittsburgh; and I say, without hesitation, that it is the duty of the court, under the circumstances of the case, to consider the whole transaction, embracing the proceedings at both places, in determining the question of fraud in the Missouri judgment.

2. Looking thus at the transactions, can it be said that fraud on the part of Heller is established by such a preponderance of proof as the law requires? This depends upon facts and circumstances shown in the evidence. The goods seized were worth largely more than the claim of Heller. The stock at Kansas City was worth at least $14,000, and that at Pittsburgh probably as much. This circumstance of itself would have but little weight, for a *bona fide* judgment creditor has a right to levy upon property of his debtor of a value greater than his judgment; but the value of the goods seized in this case is significant, in view of the further fact, which is clearly established, that

there was a systematic effort both at Kansas City and at Pittsburgh to prevent the sale of the goods at their full value.

At Pittsburgh, the stock was levied upon and advertised for sale as "two large safes and contents, a large lot of clocks, lot of watch-makers' tools, one desk, four tables, three chairs, a lot of shelving," etc.; certainly, a very imperfect description of the valuable stock of watches and jewelry to be disposed of, and not well calculated to invite competition in bidding. At the sale only two bidders appeared, who were not there, apparently, in the interest of the defendants, and these were deterred from bidding by statements made to them by persons acting in the interest of Schwed, Newhouse, and Heller, to the effect that the goods were to be purchased for a friend of theirs, and that it was desired that outsiders should not interfere. Heller, who was personally present at the sale, requested one Koemer, who was present, not to bid, and offered him his choice of several articles of jewelry to desist from doing so. The sale was made in a hurried manner,—large lots of jewelry being sold in a lump,—and the whole stock, excepting a very few articles, was bid in by Heller, who never took possession of it, but left it with Schwed & Newhouse, who at once resumed business, with no change in the style of the firm, except to have printed on their sign, in very small letters, the word "Agts." It is claimed by respondents that Heller gave the stock to his sister, who was the wife of Schwed, one of the firm of Schwed & Newhouse, and that it was as her agent that the firm continued the business. If, however, it be true that Heller obtained the confession of judgment by an arrangement with Schwed & Newhouse, and with the intent to have the stock sold, bid it in, and gave it to the wife of Schwed, and if all parties combined to prevent competition at the sale, so as to accomplish this result, then the judgment and sale were fraudulent and void as to the creditors of Schwed & Newhouse.

I am inclined to the opinion that such a transaction is fraudulent, in law, for the reason that it is not a *bona fide* effort to collect a debt, but a method of transferring property from a husband to his wife so as to place it beyond the reach of his creditors, which the law will not tolerate. In this case, I am quite clear that the transactions from their inception were fraudulent in fact. If it had been otherwise, there would have been no effort on the part of Heller, Schwed, and Newhouse to prevent competition at the sale; on the contrary, they would have been anxious to see the stock sold for the highest possible price. If it sold for more than Heller's judgment, Schwed & Newhouse would have received the excess. In that event, Heller

would have received the money due him, and could have given it to his sister if so disposed. Why, then, did they all exert themselves so zealously to prevent competition and have all the goods struck off to Heller at low prices? Evidently, because it was their purpose to divest Schwed & Newhouse of their title, without, in fact, depriving them of the stock or breaking up their business. The judgment and sale were to be effectual as against creditors, but, for all other purposes, the business was to go on. It is impossible to believe that all this circumlocution was resorted to for the sole purpose of enabling Heller to make a present of the stock to his sister. If he believed Schwed & Newhouse were solvent, why did he not take the goods from them directly in payment for his debt? If they were willing to aid him to obtain the stock by confessing judgment and preventing competition at the sale, they would, of course, have been willing to turn out goods directly to him in payment. By this simple arrangement a large expenditure for costs would have been saved, and only creditors could have raised any valid objection to it. It is clear to my mind that Heller knew, or, at least, suspected, that Schwed & Newhouse were indebted, and that he combined with them, under cover of a judgment, execution, and sale, to transfer title to Mrs. Schwed before any of the creditors could be informed.

The resort to the expensive legal proceedings shown in the evidence, when debtors and creditor were acting together in perfect harmony, can be accounted for only upon this theory. I am strengthened in this view by the fact that there was great haste and apparent secrecy in the proceedings. Why, for example, if there were no other known creditors, was it deemed necessary to have the two judgments confessed in different states on the same day, and to have executions immediately issued and levied on both stocks? Enough has been said to show the fraudulent character of the proceedings at Pittsburgh; but it is earnestly contended that there is no sufficient proof of fraud in the judgment in Missouri, which is the judgment attached and sought to be set aside in this case. If I am right in the conclusion above stated, that the two transactions are so intimately connected as that they must stand or fall together, then the badges of fraud to which I have called attention are fatal to both judgments. But there is proof tending strongly to show that the scheme which was carried out at Pittsburgh was attempted at Kansas City, and was unsuccessful only because the sale was enjoined. Here, as at Pittsburgh, the goods were kept in a safe. As soon as the execution was placed in the hands of the sheriff, Newhouse, who was in charge of

the Kansas City stock, began to depreciate the value of the goods. He claimed that he could not open the safe to enable the sheriff to examine and schedule the goods. He stated that the goods were of cheap quality and not valuable, and suggested to the sheriff to sell the whole stock in bulk. He several times suggested the same as to the sale of the safe and its contents, and the sheriff thinks he asked him if the safe and contents could not be sold without opening it. This was very strange conduct on the part of a debtor whose goods were about to be sold on execution, and it can only be explained upon the theory that here, as in Pittsburgh, it was intended to sell the goods under the execution for the benefit and advantage of Schwed & Newhouse. If such was not the case, self-interest would have dictated to Newhouse to magnify rather than depreciate the value of the goods, and to use all means in his power to have them sold for the highest possible price.

Moreover, it appears from the testimony that the representations of Newhouse, as to the value and character of the goods, were untrue. After the safe was opened, and the goods came to be examined by an expert, it was found that instead of being of the cheapest kind, and such as peddlers usually sell through the country, as represented by Newhouse, one-third of the goods were solid gold, and nearly all the balance were plated, and that the actual value of the stock, in the opinion of the expert, instead of being very small, and not over $5,000, as represented by Newhouse, was from $15,000 to $16,000, wholesale, and $20,000 to $22,000, retail. It appears further that after the levy Newhouse requested one Schribner, who had been acting as traveling agent for the Kansas City house, to remain in Kansas City, as the business would go on after the sale as before. This request must have been made with the expectation on the part of Newhouse that he, or the firm of Schwed & Newhouse, would be allowed to retain the stock after the sale in the same manner as in the case of the Pittsburgh stock. All these circumstances, and others which might be mentioned, lead inevitably to the conclusion that the judgment, execution, and levy in Kansas City were parts of a scheme by which, in connection with like proceedings in Pittsburgh, the two stores of Schwed & Newhouse were to be sold for the purpose of hindering, delaying, and defrauding creditors, and placed in the name of the wife of Schwed. The proceedings in both courts would, in my judgment, be equally void if the purpose had been to sell the Kansas City stock to pay any sum due Heller, and at the same time to transfer, under the form of a judicial sale, the Pittsburgh stock to the wife of Schwed, to be held in her

name for the benefit of Schwed & Newhouse. Such being the scheme, it would be impossible to hold it valid as to part and void as to the remainder. That Schwed & Newhouse acted with fraudulent intent is entirely clear. It would be difficult to imagine a more outrageous fraud upon creditors than appears to have been deliberately attempted by them. In the course of about six months they made purchases of merchandise on credit from 51 merchants, aggregating some $25,000, and then suddenly undertook, through confessions of judgments and sales, to transfer the very goods for which these debts were in large part contracted to a brother-in-law of one of them, with the understanding that he would allow them to retain the goods, and go on with the business under the guise of an agency.

There is no room for question here except as to whether Heller had notice of the fraudulent purpose of Schwed & Newhouse. I have already given some of my reasons for holding that he had notice. The transactions were extraordinary, unusual, and suspicious. The relations between the parties afford strong ground for the conclusion that Heller was fully advised as to the condition and purposes of the firm. Their conduct was such as to put him on inquiry and lead him to infer that they were trying to put their property beyond the reach of creditors; and, as already suggested, the conduct of Heller himself can be explained only upon the hypothesis that he knew the purpose of Schwed & Newhouse to be to defraud creditors, and intended to aid them in that purpose.

3. In view of what has been said, it is unnecessary to decide the question whether Schwed & Newhouse were *bona fide* indebted to Heller in the full amount of the judgments confessed. If it were necessary to decide this question I would examine the evidence very carefully, as I am not at present satisfied as to what the fact is. Being satisfied that the judgment was fraudulent,—in fact, given and taken with a deliberate purpose to defraud,—I hold that it must be set aside, independently of the question of the *bona fides* of Heller's claims. A creditor having a demand, however just, cannot use it as a means of defrauding other creditors of the same debtor. In a fair race for preference, if he, by diligence, secures an advantage, it may, perhaps, be maintained; but if his purpose is not to collect his debt, but to help the debtor cover up his property, he cannot shield himself by showing that his debt was *bona fide*.

4. It is alleged in the bill that the judgment in question is void because not entered in accordance with the statute of Missouri regulating the confession of judgments. It is said that the statement

upon which the judgment was rendered was defective, in that it did not set forth the facts out of which the indebtedness evidenced by the notes arose; and, as authority for the proposition that this is a fatal defect, we are cited to the case of *Chappel* v. *Chappel*, 12 N. Y. 215.

On the other hand, it is insisted that the statement and affidavits upon which the judgment was confessed were in all respects such as the statute requires. I do not go into the question because I am clearly of the opinion that it is one over which this court has no jurisdiction. The federal courts will not entertain jurisdiction to set aside the judgment of a state court for mere irregularity, or in a case where the proceeding is merely tantamount to the common-law practice of moving to set aside a judgment for irregularity, or to a writ of error, a bill of review, or an appeal. The proceedings in all such cases are to be regarded as supplementary to and connected with the original suit, and must be instituted in the same court with the original proceeding. This court can only take jurisdiction where the bill is in its nature a separate, independent, and original suit. *Gaines* v. *Fuentes*, 92 U. S. 10; *Barrow* v. *Hunton*, 99 U. S. 80.

5. I come now to a question of considerable importance in its application to this and other cases. Can this court decree a distribution of the fund now in the hands of the sheriff of Jackson county, Missouri, as proceeds of the sale of the property attached in the several attachment suits instituted by the complainants herein, in the state court, against Schwed & Newhouse. It will be observed that these attachment proceedings were instituted and conducted to judgment in the state court, and that the sale under which the sheriff holds the money in question was made in the attachment suits by order of that court. It is only the bill in chancery instituted in the state court to enjoin the Heller judgment, and set it aside, that has been removed to this court. True, the bill contains a prayer for the payment of the complainant's judgments out of said fund, but the main purpose of the suit, and the feature of it which enables this court to take jurisdiction, was the prayer for a decree setting aside the judgment of Heller for fraud.

It is well settled that the removal of the cause to this court brought with it the subject-matter of the controversy, so as to enable the court, by final decree, to dispose of the same. What was the subject-matter of this suit, which, by the removal, was brought within our control? Clearly, it was the judgment and execution in the case of Heller against Schwed & Newhouse, and not the money in the hands of the sheriff, received by him in the course of proceedings in the attach-

ment cases. These latter cases, not having been removed to this court, remain, with all their incidents, in the hands of the state court. We have no authority to make any decree disposing of property which is within the control of another court of co-ordinate jurisdiction. The state and federal courts of this country, sitting as they do in the same localities, and exercising a concurrent jurisdiction over many subjects, have great reason to observe with care the well-settled rule that the court which first gets possession of the subject-matter of a controversy must keep it until the controversy is decided, unless deprived of it by superior authority. In this case there will be a decree setting aside the judgment mentioned in the bill, but no order for the distribution of the fund in the hands of the sheriff.

Application for such an order must be made to the state court.